**SONGBIRD JET LTD., INC. and Jet Leasing Corporation, Plaintiffs,**

v.

**AMAX INC., Defendant,**

v.

**Alan P. ROSEFIELDE, William F. Handy, and Songbird, Ltd., Counterclaim Defendants.**

No. 83 Civ. 585 (EW).

United States District Court, S.D. New York.

March 27, 1985.

Lord Day & Lord, New York City, for plaintiffs and counterclaim defendants; Stephen M. Hudspeth, Darrell E. Prescott, Andrew S. Schein, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant; John L. Warden, Jeffrey S. Parker, John L. Hardiman, Jonathan S. Geldzahler, New York City, of counsel.

## OPINION

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

Plaintiffs, Songbird Jet Ltd., Inc. ("Songbird Jet") and Jet Leasing Corporation (collectively "Songbird" or plaintiffs), brought this diversity action against Amax, Inc. to recover damages upon claims for: (1) breach of contract by Amax for the sale to Songbird of a Falcon Jet plane Model 50, Serial No. 108 (the "108"); (2) fraudulent representations by Amax based upon its lack of intention to perform the agreement; (3) breach of a brokerage agreement for the sale of the 108; and (4) unjust enrichment of Amax at Songbird's expense based upon the claimed agreement for the sale of the 108.

On defendant's motion, this Court granted summary judgment dismissing all plain-tiffs' claims except that which alleged breach of contract for the sale of the 108, holding that with respect thereto there were issues of fact to be resolved upon a trial.[1] A trial has now been held upon those issues and also upon Amax's counterclaims against plaintiffs. The essential issues to be decided thereunder are: (1) whether, as Songbird alleges and Amax denies, an agreement was entered into whereby Amax agreed to sell and Songbird agreed to purchase the 108 for the net sum of $8,850,000; and (2) whether, as Amax alleges under its counterclaim and plaintiffs deny, plaintiffs breached an agreement to purchase from Amax the 108 for $9.4 million and a Falcon 50, Serial No. 8 (the "8"), for $7.5 million, and to lease to Amax a Falcon 50, Serial No. 87 (the "87"), for two years at a rental of $130,000 per month.

The terms of the alleged agreement for the sale of the 108 were negotiated on behalf of the plaintiffs by Alan P. Rosefielde, the sole shareholder and Chief Executive Officer of Songbird Jet, and on behalf of Amax by David Ayres, its Manager-Financings. In conducting these negotiations, Rosefielde acted in a close working relationship with Jet Leasing Corporation the co-plaintiff, and William F. Handy, its principal officer and controlling shareholder.[2]

Apart from the basic dispute as to the alleged contracts, also at issue is the defense that plaintiffs' claim is barred by the statute of frauds, which in large measure centers about the purpose for which a $250,000 check was remitted by plaintiffs to Amax. Another issue is the authority of Ayres, assuming that he and Rosefielde had agreed upon the terms for the sale of the 108, to act on behalf of and commit Amax thereto. With these issues sharply contested, about the only item the parties agree upon is that their resolution depends

---

1. *Songbird Jet Ltd., Inc. v. Amax Inc.*, 581 F.Supp. 912 (S.D.N.Y.1984).

2. While there is some disagreement between the parties as to the exact interrelationship of the plaintiff corporations, for the purposes of this litigation they may be referred to collectively; *see infra* note 14 and accompanying text.

upon an assessment of the credibility of participants in the negotiations, principally of Rosefielde and Ayres.

Based upon a post-trial word by word study of the trial transcript and relevant exhibits, and upon the Court's trial notes which include its contemporaneous appraisal of the demeanor and credibility of the witnesses, the Court concludes that plaintiffs have failed to sustain their burden of proof and that Amax, as counterclaim plaintiff, also has failed to sustain its claim. Their respective claims are dismissed upon the merits and judgment may be entered accordingly.

The origin of this litigation was Amax's decision, following financial reverses, to reduce its fleet of aircraft which it either owned or leased for use by its corporate executives. In pursuit of that program, Amax and Songbird officials, who had had previous relationships involving the sale or leasing of corporate jets, met on June 15, 1982 ("June 1982 meeting"). At that meeting, Ayres was one of a number of Amax officials who conferred with Rosefielde and Handy. At the time, Amax owned two Falcon Model 50 corporate jets, Serial Nos. 8 and 69 (the "8" and "69"); it was the lessee from Songbird of a Falcon Model 20F, Serial No. 388 (the "388"); and it was the owner of the 108 which was then under construction by the Falcon Jet Corporation ("Falcon") and was as yet undelivered.

### SONGBIRD'S CLAIM AGAINST AMAX FOR BREACH OF CONTRACT FOR THE SALE OF THE 108

Familiarity is assumed with the Court's opinion on the defendant's summary judgment motion which sets forth the parties' versions of what transpired at that meeting and of events subsequent thereto which led to the L.R. French, Jr. ("French") proposal, first advanced in September 1982, upon which Songbird asserts its claim that Amax

agreed to sell it the 108 for $8.85 million.[3] French owned a Lear 35A aircraft which he sought to trade in upon the purchase of the 108. It was this situation which led to a proposal by Songbird for a restructuring of the contemplated sale of the 108. In consequence, Songbird proposed that it would purchase the plane from Amax for $9 million and that Songbird, by a separate and independent agreement with French, would sell the 108 to him and accept the Lear as a trade in with the expectation of selling it on the open market and applying the proceeds toward the purchase price to be paid to Amax. Also contemplated was a sale by Amax to a third party of the tax benefits of the 108 (still under construction) by the end of the year. The proceeds of this tax benefit transfer ("TBT"), estimated to be about $2.8 million, were to be applied toward Amax's original asking price of $9 million, later reduced to $8.85 million by an allowance for the cost of shifting the lavatory on the plane, a condition also required by French.

At a meeting on October 8, 1982, Rosefielde submitted to Ayres the substance of a proposal, but without definitive terms, whereby Amax would sell the 108 directly to Songbird, which Ayres said he would "run ... up the flagpole with the senior management."[4] After consulting with R. Bern Crowl, Executive Vice President and Chief Financial Officer of Amax, Ayres indicated interest in the Rosefielde proposal and requested that he submit a copy of Songbird's purported but yet unsigned agreement with French, and that Songbird send Amax a check for $250,000. At a meeting on October 28th, Rosefielde submitted a copy of a draft agreement with French to Ayres, who turned it over to Amax's legal department to determine among other matters whether French was committed to plaintiffs for the purchase of the plane. On October 29th, John Kennedy, the Controller of Jet Leasing, upon

---

3. *Id.* at 915–18. The factual situation covering the period between the June 15, 1982 meeting and up to the French offer is discussed hereafter under Amax's counterclaim since it presents different issues.

4. Record at 538.

instructions of Handy in response to Rose-fielde's request, forwarded a check payable to Amax for $250,000, accompanied by a letter the full text of which is set forth and discussed hereafter. The check was deposited by Amax and the proceeds entered on its books as an account payable to Jet Leasing Corporation.[5] The plaintiffs contend that the events of October 28–29 constituted an oral agreement for the sale of the 108 and that subsequent events were intended to memorialize the terms agreed upon orally on those dates.

Thereafter, Rosefielde and Ayres continued their negotiations with respect to the proposed transaction. Their discussions covered a broad range of items including, but not limited to: (1) whether the 108 would be delivered to Amax by Falcon, the manufacturer, by the end of December 1982, a *sine qua non*, if the benefits of the TBT were to be realized; (2) the assumption of a leasehold interest by French with respect to the TBT; and (3) an indemnity agreement that Amax sought from French with respect to the TBT proposal. Another outstanding issue was transfer of warranties from Falcon of the yet undelivered 108 to run in favor of French as a prospective transferee of the plane. At no time during their negotiations was there any direct contact between French and Ayres or any representative of Amax. Rosefielde carried on separately all negotiations with French, as he did separately with Ayres.

During November and December 1982, drafts of proposed agreements were prepared by Amax's legal department following discussions between Rosefielde and Ayres and sent to Rosefielde on November 16th, December 3rd, and December 7th; the last was not received by him until December 11, 1982. The first two drafts were unacceptable to Rosefielde because, as he testified, they did not reflect the terms of

the Songbird Jet-French agreement. He conceded that the last draft embodied the terms of the claimed oral agreement reached by him and Ayres on October 28–29. However, this draft was never executed by Rosefielde.

Ayres disputes that Rosefielde accepted the terms of the third draft, and instead claims that he advanced an additional proposal that $250,000 deposited by French under an escrow agreement with Songbird be taken by assignment by Amax who then was to return the $250,000 previously received by it from Songbird. Ayres requested an executed copy of the Songbird-French contract and escrow agreement, and Rosefielde, for the first time, submitted them. The proposal for substitution of the escrow money was sent by Ayres to the Amax legal department but no action was taken on it.

At this juncture of the negotiations, about mid-December 1982, while it appeared that a warranty transfer from Falcon to French was feasible, there was uncertainty that the 108 would be in service by the end of December 1982 so that Amax could transfer the tax benefits; Amax officials were just starting negotiations for the sale of the 108's tax benefits to a third party; and no steps had been taken to negotiate with French an indemnity agreement with respect to his acceptance of a leasehold interest between him and the yet undetermined participant in the TBT plan. The third draft, which Rosefielde claims was ready for execution, reflects these uncertainties. Not only were the price terms left blank, so too were references to the name of the potential third party to whom Amax was to sell the 108's tax benefits as well as the precise date in December 1982 that the TBT agreement with the unknown third party was to be executed.[6]

---

**5.** This date is given to preserve the chronology of events under the claim as advanced by plaintiffs. Payment was stopped on this check; Amax did not receive the proceeds until November 10th when it received a third and corrected check from plaintiffs. *See infra* note 17.

**6.** The provision reads:

Purchaser acknowledges that its purchase of the Aircraft will be subject to the terms and

provisions of an Agreement dated December _____, 1982 (the "Tax Benefit Transfer Agreement"), between Seller and _____ ("Tax Lessor"), a copy of which has heretofore been furnished to Purchaser by Seller, and agrees to deliver to Tax Lessor, as a condition precedent to its right to purchase the Aircraft hereunder, its written consent to acquire the Aircraft subject to the Tax Benefit Transfer

Toward the latter part of December 1982 when Ayres submitted the terms of the proposed sale of the 108 to senior management and the Chairman of the Amax Board of Directors, they refused assent thereto or to submit the proposal for Board approval, and plaintiffs were notified of that fact on or about December 20th. On January 3, 1983 Ayres wrote Rosefielde that he was returning the $250,000[7] since no agreement had been or would be entered into. Thereupon plaintiffs instituted this action.

Plaintiffs, as noted, contend that an oral agreement was reached between Rosefielde and Ayres on October 28–29 which was intended to be operative, that any writings were only to memorialize that agreement, and that Ayres had authority to enter into such an agreement so as to bind Amax.

■ In this diversity action, the applicable law is that of New York State. Under its rule, the issue is the intent of the parties as revealed by their objective manifestations, taking into account the totality of the attendant circumstances.[8] As our Court of Appeals recently noted:

> Under New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs. *Scheck v. Francis*, 26 N.Y.2d 466, 311 N.Y.S.2d 841, 843, 260 N.E.2d 493, 494 (1970). This rule holds even if the parties have orally agreed upon all the terms of the proposed contract. *Schwartz v. Greenberg*, 304 N.Y. 250, 107 N.E.2d 65 (1952). On the other hand, where there is no understanding that an agreement should not be binding until reduced to writing and formally executed, and "[w]here all the substantial terms of a contract have been agreed on,

and there is nothing left for future settlement," then an informal agreement can be binding even though the parties contemplate memorializing their contract in a formal document. *Municipal Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144, 417 N.Y.S.2d 218, 220, 390 N.E.2d 1143, 1145 (1979); *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969).... What matters are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances....

> ....

> Freedom to avoid oral agreements is especially important when business entrepreneurs and corporations engage in substantial and complex dealings. In these circumstances there are often forceful reasons for refusing to make a binding contract unless it is put in writing. The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing. These considerations are not minor; indeed, above a certain level of investment and complexity, requiring written contracts may be the norm in the business world, rather than the exception. *See International Telemeter Corp. v. Teleprompter Corp.*, 592 F.2d 49, 57–58 (2d Cir.1979) (Friendly, J., concurring).[9]

■ Upon the totality of the record, the Court finds that no oral agreement was reached between Rosefielde and Ayres on

---

Agreement in the form thereof attached hereto as Appendix 5. Plaintiffs' Exhibit 42, Article 7.1.

**7.** Amax deducted $53,789.68 which it claimed was due it with respect to other transactions and enclosed a check for the difference. Plaintiffs initially disputed the deduction and this was one of the claims advanced in this litigation but was compromised by the parties.

**8.** *Brown Bros. Elec. Contractors, Inc. v. Beam Construction Corp.*, 41 N.Y.2d 397, 361 N.E.2d 999, 1001–02, 393 N.Y.S.2d 350, 351–52 (1977).

**9.** *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74–75 (2d Cir.1984).

October 28–29, 1982 upon the terms and conditions for the sale of the 108. Moreover, assuming contrary to the foregoing, that they had agreed orally upon all the terms of the proposed contract, the Court further finds that both Rosefielde and Ayres knew such an oral agreement was subject to approval by Amax's Board of Directors and was not to be binding until reduced to writing and formally executed by the parties.

This was no run-of-the-mill, over-the-counter transaction where terms and conditions of a sales contract are fairly well established and, in effect, are recognized as a custom of the trade. It was a structured, multi-faceted deal of magnitude, with a purchase price of some $9,000,000—no small change even in the life of a modern day giant corporation. The proposed transaction encompassed and required resolution of numerous and complex details, involving five separate and independent entities with commitments to be made that had to satisfy the requirements of Amax and were subject to approval of its counsel. That plaintiffs themselves did not intend to be bound based upon oral discussions taking place on October 28th or 29th is reflected in the agreement they signed with French four days later. That agreement, signed by Rosefielde on November 4, 1982, provides in part:

Seller [Songbird Jet] agrees to enter into a binding written contract to acquire the Falcon 50–108 from Amax, Inc., the terms and conditions of which are entirely satisfactory to Purchaser [French]. [T]he parties acknowledge that no claim for liquidated damages shall arise in the event Amax, Inc. refuses to enter into an agreement of sale with Seller on mutually acceptable terms and conditions.[10]

And entirely apart from the foregoing, Rosefielde knew that Ayres was without authority, express, implied,[11] or apparent,[12] to bind Amax to any contract absent Amax Board approval. He was aware of this because of other transactions with Amax which antedated the one at issue. Further, because Amax officials were of the view that plaintiffs and their principals had failed to live up to what Amax deemed prior commitments, shortly prior to Rosefielde's advancing the proposal to purchase the 108, plaintiffs were put on notice by telex on September 14, 1982 that the sale of the 108 was "conditional upon Amax Board approval and upon the execution of documentation satisfactory to Amax."[13] This telex was addressed to Handy. It is idle for Rosefielde to contend he was unaware of it in view of his testimony of his relationship to Handy with respect to the prospective transaction.[14]

**10.** Plaintiffs' Exhibit 43.

**11.** *See Masuda v. Kawasaki Dockyard Co.,* 328 F.2d 662, 664–65 (2d Cir.1964); *Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 84 (3d Cir.1960); *Greene v. Hellman,* 51 N.Y.2d 197, 412 N.E.2d 1301, 1305, 433 N.Y.S.2d 75, 79 (1980).

**12.** *Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 85 (3d Cir.1960); *Greene v. Hellman,* 51 N.Y.2d 197, 412 N.E.2d 1301, 1306, 433 N.Y.S.2d 75, 80 (1980); *Ford v. Unity Hospital,* 32 N.Y.2d 464, 299 N.E.2d 659, 664, 346 N.Y.S.2d 238, 244 (1973).

**13.** Defendant's Exhibit EE. This telex was the first response by Ayres to a series of telexes by Handy registering certain customers to whom plaintiffs could offer the 108 exclusively. On September 29, 1982, Handy telexed Ayres that he was registering French as a potential purchaser of the 108, stating that he was "reiterat[ing] our understanding."

It should also be noted that the third draft upon which plaintiffs rely includes a provision referring to Board resolutions as follows: "At the closing, Seller [Amax] shall deliver to Buyer a Certified Resolution of Seller [Amax] authorizing the transaction contemplated by this Agreement ..." Plaintiffs' Exhibit 42, Art. 2.7. In addition, the agreement Rosefielde entered into with French on November 4, 1982 also provides that French was not "obligated to close the transaction to purchase the ... 108 unless .... [he] received certified copies of the corporate resolutions of Amax, Inc. and Seller authorizing the sale ..." Plaintiffs' Exhibit 43.

**14.** Record at 1012–13 ("Jet Leasing Corporation was to find a purchaser for either No. 8 or No. 108, and ... Songbird Jet Ltd. Inc. ... would, in turn negotiate, complete all agreements and provide whatever funds were necessary to make performance possible, and ... the net profit would be split 50–50.") (Rosefielde testimony); *see also id.* at 94–95, 1021 (same); *id.* at 912–20

■ Finally, while the foregoing findings make it unnecessary, it is desirable to dispose of plaintiffs' contention that the statute of frauds does not bar recovery since the $250,000 forwarded to Amax constituted a partial payment on account of the purchase price and, hence, partial performance of the claimed contract under N.Y.U.C.C. § 2–201(3)(c). The Court finds, contrary to plaintiffs' contention, that the $250,000 was not a payment on account of the purchase price but a good faith deposit to induce Amax to take the plane off the market pending negotiations between Rosefielde and Ayres to conclude an agreement for its sale.[15] The $250,000 check, which carried on its face the legend, "Refundable Deposit," was accompanied by a letter which reads:

Mr. David Ayres

Amax, Inc.

Amax Center

Greenwich, CT 06830

Re: Falcon 50, Serial # 108

Dear Mr. Ayres:

Attached is our check for $250,000 representing a refundable deposit for the purchase of above referenced aircraft.

Said deposit will be immediately refunded to Jet Leasing Corporation in the event, for any reason, that Jet Leasing Corporation would request in writing said deposit refunded.

Should Jet Leasing Corporation not request refund before final agreement on said aircraft and should agreement be finalized on said aircraft between Jet Leasing Corporation and Amax Inc., and at the sole discretion of Jet Leasing Corporation, said deposit will be credited towards final aircraft purchase price or refunded to Jet Leasing Corporation.

Very truly yours,

/s/ John Kennedy

John Kennedy

Controller [16]

The letter, apart from the fact that it notes "should agreement be finalized," [17] provides an escape hatch for plaintiffs—a "heads I win, tails you lose" situation in their favor—since it requires an immediate refund of the deposit "for any reason" upon plaintiffs' demand. Plaintiffs seek to attenuate the force of the clear language of this document upon a contention that Kennedy sent the check upon instructions of Handy who did not inform him of the substance of negotiations between plaintiffs and Amax; that Kennedy in drafting the letter acted upon his own initiative without knowledge of the terms of the transaction; and that it was Kennedy's "brainchild" and unrelated to the actual transaction as it was conducted by the immediate negotiators.[18] Indeed, upon the trial it was argued on behalf of plaintiffs, in Alice-in-Wonderland style, that the word "refundable" appearing on the check had no meaning.[19]

(Handy testimony); *id.* at 324, 468 (Ayres testimony).

15. *See* Official Comment, N.Y.U.C.C. § 2–201(3)(c) (McKinney 1964) ("Part performance by the buyer requires the delivery of something by him that is accepted by the seller as such performance"); *Presti v. Wilson,* 348 F.Supp. 543, 546 (E.D.N.Y.1972); *see also Gross v. Vogel,* 81 A.D.2d 576, 437 N.Y.S.2d 431 (2d Dep't 1981) (part performance exception is based on theory of equitable estoppel; acts must have been performed in reliance); *cf. Thomaier v. Hoffman Chevrolet, Inc.,* 64 A.D.2d 492, 410 N.Y.S.2d 645, 647 (2d Dep't 1978) (substantial down payment); *Acuri v. Figliolli,* 91 Misc.2d 831, 398 N.Y.S.2d 923, 925 (Nassau Co.1977) (payments made "on account" of the purchase price).

16. Plaintiffs' Exhibit 47.

17. November 4th was the last date of three letters, each substantially the same, with which were enclosed the check with its legend. The first check dated October 29th was returned to plaintiffs since Kennedy had issued a stop payment order; the second check was made payable to Amax, Australia, Inc., an incorrect payee; the third check was not received and deposited by Amax until November 10, 1982.

18. Record at 805.

19. In response to the Court's comment: "[y]ou have to take the position the word 'refundable' has no meaning there," counsel for plaintiffs responded: "That's right. The word 'refundable' has not the meaning that was the purpose of the $250,000 payment ..." *Id.* at 812.

The explanation does not wash. These arguments suggest that Kennedy, the Controller of Jet Leasing, was a witless robot, entirely unaware of events, who automatically carried out Handy's instructions. It is not without interest that when Handy instructed Kennedy to issue the check, following Rosefielde's request, Handy told Kennedy to "use an abundance of caution." [20] The fact is that Kennedy sent copies of the letter which accompanied the check to Rosefielde following their dispatch to Amax and that Rosefielde, the negotiator, who now contends that the letter did not accurately reflect the parties' arrangement, never attempted to correct the letter. Indeed, it is not without significance that, although a practicing lawyer for a number of years until he became active in the jet aircraft business, Rosefielde's comment, with respect to the terms of the Kennedy letter, was to ask Handy "what law school he [Handy] went to." [21] Finally, there is the fact that the $250,000 when received by Amax was entered on its books as an account payable to Jet Leasing.

Accordingly, plaintiffs' claim fails and defendant is entitled to judgment upon the merits.

### AMAX'S COUNTERCLAIMS AGAINST PLAINTIFFS

■ Amax's counterclaims for breach of contract and fraudulent representations with respect thereto are based upon discussions between its officials and Rosefielde and Handy at the June 15, 1982 meeting. It contends that at the meeting Rosefielde and Handy on behalf of plaintiffs made a package offer (1) to buy the 108 for $9.4 million; (2) to buy the 8 for $7.5 million; and (3) to lease to Amax a Falcon Jet Model 50, Serial No. 87, for two years at a rental of $130,000 per month.[22] It is further contended that plaintiffs' proposal was accepted by Amax as a "package" deal by its Board of Directors on July 1, 1982 by an appropriate and recorded resolution, notice of which was given by Ayres to Handy on or about July 12, 1982.

Plaintiffs deny they made any offer at the June 1982 meeting. The evidence sustains their position. The June meeting was a discussion session where the participants exchanged views and sounded one another out on Amax's contemplated program of reducing its corporate jet fleet. Indeed, Amax's own officials who were participants made it clear that no offer, such as is the predicate for defendant's counterclaims, was made. Thus, Edward S. Miller, its Senior Vice President-Administration, questioned that "we had a deal, but that we would seek authority to negotiate such a deal as a package and would recommend to our board and management entering into such a transaction." [23] Similarly, John Anthony Esposito, Flight Operations Manager for Amax, testified that while there was a lot of conversation, the meeting was inconclusive.

The resolution passed by the Board thereafter was authorization by Amax to its officers to enter into an agreement with plaintiffs. The evidence does not sustain Amax's claim that the resolution was acceptance of an offer by plaintiffs of a "package" deal. The resolution itself specifies that the authorization is "to enter into an agreement *or* agreements" with respect to the various planes described therein.[24] Indeed, Pierre Gousseland, Amax's Chief Executive Officer, acknowledged that under the resolution, Amax "could either choose to enter into the contract or could choose not to enter into the contract." [25]

Moreover, subsequent events negate the claim of a package deal or that the resolu-

**20.** *Id.* at 975–76.

**21.** *Id.* at 62.

**22.** A fourth plane, a Falcon Model 20F, the 388, had been discussed at the June meeting, but at the time the corporate resolution had passed, its lease had been cancelled.

**23.** *Id.* at 738.

**24.** Plaintiffs' Exhibit 83 (emphasis added).

**25.** Record at 487.

tion was acceptance of any offer. Thereafter, plaintiffs and defendant each were separately engaged in activities on the open jet plane market with respect to each of the planes that had been the subject of discussions at the June meeting. In fact, Amax complained that during the summer of 1982, it received offers from plaintiffs to purchase one or both of the Falcon 50 jets which differed from and were far below the amounts discussed at the June meeting. It was this situation that led to a lack of confidence by Amax in plaintiffs and to the specific notice to them that any contract for the sale of the 108 was "conditional upon Amax Board approval and upon execution of documentation satisfactory to Amax." [26]

Finally, that Ayres himself was of the view that there was no agreement, such as is now contended by Amax in its counterclaim, is evident from defense counsel's response to the Court's inquiry as to why no contract was ever executed following the passage of the July 1, 1982 resolution and Ayres's notification to Rosefielde on July 12, 1982 of its passage. Counsel stated: "Ayres simply dropped the ball frankly and he didn't do it.... [He] probably should have gone ahead and asked the Amax lawyers to begin drafting agreements. He simply failed to do so." [27]

The fact is that the events in July and August leading up to the French proposal indicate neither party considered a contract was in effect. In sum, Amax has failed to sustain its burden of proof upon its counterclaims and plaintiff is entitled to a dismissal thereof upon the merits.

So ordered.

---

**26.** Defendant's Exhibit EE.   **27.** Record at 1133.