**SHEARSON LEHMAN CMO, INC., Plaintiff,**

v.

**TCF BANKING AND SAVINGS, F.A., Defendant.**

**No. 87 Civ. 8169 (MBM).**

United States District Court, S.D. New York.

March 31, 1989.

Linda Yarden, Jane E. Booth, Thomas E. Hommel, Shearson Lehman Hutton Inc., Office of General Counsel, New York City, for plaintiff.

Timothy D. Kelly, Timothy D. Kelly, P.A., Minneapolis, Minn. (Cindy J. Larson, of counsel), Peter E. Calamari, Hertzog, Calamari & Gleason, New York City (Anthony L. Paccione, of counsel), for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Defendant TCF Banking and Savings, F.A. (TCF), a federally chartered savings and loan institution with its principal place of business in Minnesota, moves for summary judgment dismissing the diversity breach of contract and promissory estoppel suit of Shearson Lehman CMO, Inc. (Shearson), a Maryland corporation with its principal place of business in New York, and its executive offices in Texas. Fed.R.Civ.P. 56(b). For the reasons explained below, TCF's motion is granted and the complaint is dismissed.

Shearson is a subsidiary of Shearson Lehman Hutton Inc. The facts are seen in the light most favorable to Shearson, the non-moving party, with all reasonable inferences drawn in the firm's favor. *Donahue v. Windsor Locks Bd. of Fire Comm'rs.*, 834 F.2d 54, 57 (2d Cir.1987) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (*per curiam* )). Shearson buys mortgage backed certificates guaranteed by various federal agencies, and finances those transactions by selling collateralized

mortgage obligations (CMO's) that are secured by the mortgage certificates. Government agencies create mortgage backed certificates by buying mortgages from lenders such as commercial banks and savings and loan associations, and selling the right to the cash flow from a small subset of these mortgages. These certificates are secured by the mortgages, which are in turn secured by the properties themselves.

CMO's convey the right to obtain a portion of the cash flow from a pool of mortgage backed certificates. The CMO's issued to buy a specific group of mortgage backed certificates are referred to collectively as a CMO trust, and usually last for a specific period of time. Because CMO's have a AAA rating, investment bankers such as Shearson normally underestimate the amount of cash that a given pool of certificates can produce, thereby guaranteeing to the greatest extent possible that investors will receive the amount of cash that they contracted to receive, plus their principal at the end of the investment. However, the cash flow from a given pool of mortgage backed certificates often is well in excess of what is required to pay off the CMO holders. What is left over is called the residual cash flow. A CMO residual is simply the right to receive that excess cash flow over the life of the CMO trust.

On March 5, 1987, after Shearson presentations to TCF, and after negotiations between the two parties, John D. Kightlinger, the director of TCF's investment department, and Philip R. Erlanger, a Shearson vice president, agreed that TCF would buy 49% of the residual interest in a CMO trust known as Shearson Mortgage Backed Sequential Pay Bonds Series G (Series G CMO residuals). The parties agreed to a specific internal rate of return for the bonds, and the basis for calculating that internal rate of return, and the price. Shortly thereafter Shearson then sent by telecopy a mockup of a financial advertisement describing TCF's purchase, commonly called a tombstone. TCF changed about three words in the proposed tombstone and returned it to Shearson for typesetting. In addition, because these residuals were being sold pursuant to § 4(2) of the Securities Exchange Act of 1933, as amended, 15 U.S. C. § 77d(2) (1982), a draft private placement memorandum and purchase agreement were sent to TCF for its comments.

After reviewing the drafts, TCF found problems with the deal's structure, and found that if it purchased the Shearson Series G CMO residuals, it would face previously unforseen tax and accounting problems. When those problems were not resolved to TCF's satisfaction by the time Shearson demanded performance, TCF refused to buy the residuals. This action ensued.

In its suit, Shearson sues for breach of contract, alleging that the March 5, 1987 conversation between TCF and Shearson constituted a valid oral agreement. Alternatively, Shearson would estop TCF from denying the existence of a contract. After extensive discovery, TCF brings the current motion.

Under Fed.R.Civ.P. 56(c), a trial judge must grant summary judgment if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984). The moving party has the initial responsibility of informing the court of the basis for its motion, and identifying "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which the movant believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 (1970). However, once a movant meets that burden, and establishes a *prima facie* case for summary judgment, the opponent of summary judgment must adduce enough evidence to support a jury verdict in his favor. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at

2510 (citing *First Nat'l Bank of Ariz. v. Cities Svc. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)); *see Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2727 (2d ed. 1983).

■ While courts are obligated to resolve all ambiguities in favor of the non-moving party, and draw all reasonable inferences in its favor, in determining whether there is a genuine issue of material fact, the opposing party must provide concrete particulars showing that a trial is needed, not merely assert a conclusion without supplying supporting arguments or facts in opposition to the motion. *Horn & Hardart Co.*, 751 F.2d at 77 (citing *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)). Put another way, when there is nothing more than a metaphysical doubt as to the material facts, summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Under New York law, which the parties agree controls the disposition of this motion, an oral agreement can form a binding contract even though the parties expect to memorialize their agreement in a formal writing. *E.g., Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1985) (citing cases). On the other hand, "there are still situations where the absence of a signed, formal agreement is fatal to an argument that a contract exists." *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261 (2d Cir.) *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984). "What matters are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances." *Horn & Hardart Co.*, 751 F.2d at 74 (collecting cases); *Hotchkiss v. National City Bank of N.Y.*, 200 F. 287, 293 (S.D.N.Y.1911), *aff'd sub nom. Ernst v. Mechanics' & Metals Nat'l Bank of City of N.Y.*, 201 F. 664 (2d Cir. 1912), *aff'd sub nom. National City Bank of N.Y. v. Hotchkiss*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913) (Judge Hand's famous observation the secret intentions of a contracting party, even when attested to by 20 bishops, will not be given force in a contract).

■ In order to determine if the parties contemplated being bound by an oral contract or a written agreement, four factors are considered: (1) Whether the parties expressed to one another that they would be bound only by a written agreement; (2) whether there has been partial performance of the contract and that partial performance has been accepted; (3) whether all of the terms have been agreed upon and there is nothing left to negotiate; and (4) whether the agreement is the sort that is usually written. *Mediafare Entertainment Corp.*, 777 F.2d at 80; *Horn & Hardart Co.*, 751 F.2d at 75–77; *SCM Corp.*, 727 F.2d at 261–63; *see Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 361 N.E.2d 999, 393 N.Y.S. 2d 350 (1977). No single factor is decisive; each provides significant guidance. *Horn & Hardart Co.*, 751 F.2d at 75; *Songbird Jet, Ltd. v. Amax Inc.*, 605 F.Supp. 1097, 1101 (S.D.N.Y.) (Weinfeld, J.), *aff'd mem.*, 779 F.2d 39 (2d Cir.1985), *aff'd mem.*, 812 F.2d 713 (2d Cir.1987).

■ Shearson asserts that the parties never expressed to one another their desire to be bound only by a written agreement. Shearson's contention is without merit. A mutual intent not to be bound by anything other than a writing is " 'conclusively establish[ed]' when neither party [takes] exception, over the course of bargaining, to provisions in the drafts of the proposed contracts which state[ ] that '*when executed and delivered*, this '... Agreement ... will be a valid and binding agreement.' " *Horn & Hardart*, 751 F.2d at 75 (emphasis in the original, citing *SCM Corp.*, 727 F.2d at 262); *c.f. Teachers Ins. & Annuity Assoc. of Am. v. Tribune Co.*, 670 F.Supp. 491, 500 (S.D.N.Y.1987) (finding that a binding preliminary commitment which required further steps was a valid contract). That is exactly what happened here. There is no evidence that either party took exception to the clause in the draft

purchase agreement with TCF which read: "If you are in agreement with the foregoing, please sign a counterpart hereof and return the same to [Shearson], whereupon this Agreement shall become a binding agreement between you and (Shearson]." Affidavit of Linda Yarden (Yarden Affidavit) Exhibit H (Shearson Lehman CMO Trust I Participations Purchase Agreement dated March 31, 1987) at 16. This clause is almost identical to the one in *SCM Corp.* that formed the basis for the court's finding of a mutual reservation of the right not to be bound before a writing was executed. Moreover, Shearson has adduced no evidence that any party commented in any way about the provision, or protested its inclusion.

Alternatively, Shearson argues that a reservation of the right to be bound only by a writing would have been wholly inconsistent with Shearson's spending time, money, and resources in bringing Series G CMO residuals to market. Shearson's contention is illogical. It is completely consistent for a large brokerage house to expend money in preparing to market a complex product, and still expect that the transaction will be consummated in writing. In fact, almost all private placements of Shearson CMO residuals were concluded in writing. Deposition of Robert E. Guglielmo at 6–8, 95. Presumably, Shearson spent a great deal of time and money putting those deals together as well.

Turning to the second factor, Shearson asserts that its most compelling evidence of partial performance is the delivery to TCF of the proposed tombstone, which was then returned by TCF with suggested revisions, which were incorporated. Shearson also asserts that after March 5, 1987, it purchased the securities to be used in the transaction. Shearson therefore claims that it partially performed its obligations under the alleged contract, and that that partial performance was accepted by TCF. Shearson's contention is without merit.

■ As an initial matter, for there to be partial performance, Shearson must confer something of value on TCF, which TCF accepts. *E.g., Horn & Hardart Co.,* 751

F.2d 75; *V'Soske v. Barwick,* 404 F.2d 495 (2d Cir.1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969). Mere preparatory acts are not partial performance. *E.g., Horn & Hardart Co.,* 751 F.2d at 76 (forming a partnership in order to facilitate the transaction is not partial performance).

■ Shearson's purchase of securities did not confer a benefit upon TCF. Instead, it was a paradigmatic example of a preparatory act. Therefore, the purchase of the securities is not evidence of partial performance. Similarly, Shearson's sending the draft tombstone to TCF also was not partial performance. Certainly, TCF wanted to have its association with Shearson and with CMO residuals well publicized, but TCF did not come to Shearson to have Shearson's art department prepare a tombstone. As Erlanger testified, TCF wanted the tombstone published at the close of the transaction. Yarden Affidavit Exhibit B (1 Deposition of Philip R. Erlanger (Erlanger Deposition) at 83). The mere drafting and marking up of a tombstone is no more partial performance than TCF's accepting Shearson's long distance calls while the parties were negotiating the transaction. The passing of documentation back and forth, including a tombstone, necessarily means that one of the parties will have to spend money to prepare and revise the draft, and that the expenditure may then benefit both parties. However, that does not change the essential character of the act. It is still merely preparatory.

■ As to the third factor, Shearson asserts that there was nothing left to negotiate in this transaction. The facts, when seen in the light most favorable to Shearson, reveal that TCF agreed to buy a stated quantity of securities at a stated price, with interest and collateral agreed to as well. Yarden Affidavit Exhibit A (1 Deposition of John D. Kightlinger (Kightlinger Deposition) at 116–118). Alternatively, Shearson asserts that the question of whether there was a meeting of the minds is a fact question, and therefore, summary judgment is improper. Again, Shearson's argument does not survive scrutiny.

As noted in *Horn & Hardart Co.*, "[t]he actual drafting of a written instrument [frequently] will ... reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution." 751 F.2d at 75. In this case, TCF reviewed a draft of the private placement agreement, became concerned about the tax and accounting implications of the transaction, and then discussed those concerns with Shearson during March and April. These concerns were not chimerical. For example, TCF's tax attorneys asked Shearson's attorneys to issue an opinion that the Series G CMO residuals were free of certain tax problems. Deposition of Lynn Nagorske 54–55. The opinion issued by Shearson's counsel, as interpreted by TCF's counsel, indicated that just the opposite was true. Affidavit of Lynn Nagorske at ¶ 2 & Annex 3. Shearson clearly understood that these concerns had to be resolved before TCF would purchase the securities. Yarden Affidavit Exhibit B (1 Erlanger Deposition at 93–97; 102–107). Therefore, well after March 5, 1987, terms that both sides understood were crucial to the agreement were still being negotiated. Under these conditions, there is no ambiguity about whether there has been a meeting of the minds. That agreement may have been reached as to quantity of securities, price, interest and the like does not change the result. Agreement on terms does not become binding until there is agreement on all terms as to which agreement was anticipated. *Mediafare Entertainment Corp.*, 777 F.2d at 82–83; *Horn & Hardart Co.*, 751 F.2d at 76–77.

Turning to the final factor, Shearson asserts that the custom of the securities industry is to conclude deals orally, not in writing. In support of its position, Shearson adduces deposition evidence that it argues shows that the securities industry operates on oral commitments, and that TCF itself believed that it was bound by an oral agreement.

In determining whether this final factor is present, courts often look at the complexity of the proposed transaction. *Mediafare Entertainment Corp.* 777 F.2d at 83; *Horn & Hardart Co.*, 751 F.2d at 77; *SCM*

*Corp.*, 727 F.2d at 262–63; *Amax Inc.*, 605 F.Supp. at 11.02. This is done in an effort to understand whether "this is the kind of agreement where it would be unusual to rely on an oral understanding." *Horn & Hardart Co.*, 751 F.2d at 77.

Shearson's contentions are correct, but are largely irrelevant to the resolution of this issue. It is certainly true that the securities industry as a whole "tends to be an oral business, ... [that] do[es] very large trades based on what you say." Yarden Affidavit Exhibit E (Deposition of Stanley Mehaffey at 112). However, as Erlanger testified in his deposition, "I think that each CMO is a unique transaction fundamentally." Yarden Affidavit Exhibit B (1 Erlanger Deposition at 102). Moreover, in response to questions about CMO's, Erlanger differentiated his own job from that of a typical broker by saying that "... sales and trading is clearly a handshake business, and in many respects CMO arbitrage, CMO issuance is a more complex trade—is a complex trade." *Id.* (1 Erlanger Deposition at 176). In addition, in response to the question: "[Is trading in CMO residuals] more complex than trading in CMO bonds themselves?" Erlanger responded: "I would agree...." *Id.* (1 Erlanger Deposition at 177). Therefore, while it is possible that some securities trading is done orally, the evidence, even when seen in the light most favorable to Shearson, indicates that trading in CMO bonds is more complex than trading in the secondary market, and that trading in CMO residuals is of an even higher degree of complexity.

As for the evidence that TCF also thought that CMO residuals were traded orally, Shearson asserts that at a March 31, 1987 meeting of the TCF Asset Liability Committee, convened specifically to discuss the purchase of the Series G CMO residuals, TCF referred to its current position to purchase the CMO residuals as "committed." Yarden Affidavit Exhibit J at 2. However, when read as a whole, the minutes of this meeting indicate that the accounting, legal, and investment departments were still expected to review TCF's

purchase of the Series G CMO residuals before any final decision was made. *Id.* at 3. Therefore, the term "committed" was not used to describe a completed transaction, but simply an ongoing intent that was subject to change.

This deal was not only complex, but was also for a great deal of money. With close to $21 million to change hands as a result of this transaction, "a requirement that the agreement be in writing cannot be a surprise to anyone." *Horn & Hardart*, 751 F.2d at 77; *see Amax Inc.*, 605 F.Supp. at 1102. Moreover, the determination that this factor should be resolved in TCF's favor "is consistent with the realities of the complex transaction at issue." *SCM Corp.*, 727 F.2d at 262.

An analysis of the four factors used to determine the existence of a contract, and the evidence adduced in support of the parties' positions, shows beyond dispute that the parties did not intend a contractual obligation to exist before a signed writing existed. Therefore, no contract came into existence on March 5, 1987 between Shearson and TCF. Accordingly, TCF's motion for summary judgment dismissing Shearson's first claim, brought against TCF for breach of contract, is granted.

█ Shearson's promissory estoppel claim is equally deficient. Promissory estoppel arises when a promise clear and unambiguous in its terms, leads a promisee foreseeably and reasonably to change its position in reliance on the promise, and thereby become injured. *Esquire Radio & Elecs. Inc. v. Montgomery Ward & Co.*, 804 F.2d 787, 793 (2d Cir.1986) (citing *Restatement (Second) of Contracts* § 90 (1981)); *Horn & Hardart Co.*, 751 F.2d at 78 (citing cases); *SCM Corp.*, 727 F.2d at 264; *Paretti v. Cavalier Label Co.*, 702 F.Supp. 81, 84 (S.D.N.Y.1988); *c.f. Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34 (2d Cir.1977) (*per curiam*) (discussing the prerequisites to showing promissory estoppel to defeat the defense of the statute of frauds).

█ The real issue here is whether there was a promise clear and unambiguous in its terms. Taking the evidence in the light most favorable to Shearson, the record reveals that Kightlinger made a promise to purchase 49% of Series G CMO residuals at a given price, for a given internal rate of return calculated in a specific and agreed upon way. Moreover, the parties agreed to the collateral for these residuals. As Erlanger put it "I forced [Kightlinger] to state all of the parameters." Yarden Deposition Exhibit B (1 Erlanger Deposition at 80). However, the promise given by Kightlinger on behalf of TCF was not clear and unambiguous.

Erlanger of Shearson describes what was discussed in the March 5, 1987 telephone conversation after the price, quantity, interest rate, and collateral were agreed upon:

Q: Anything else about the procedure for obtaining the TCF commitment other than what you've told me?

A: Yes. There was a contemplated document trail that was agreed upon at the time of the transaction, which would culminate in the ... signing of a private placement memorandum, which would be the contractual commitment in writing that corresponded to the oral commitment that TCF made to acquire the residual, and related documents. There was furthermore—

Q: A signing of the private placement memorandum?

A: A signing as in a—

Q: Execution?

A: Yes, execution.

Q: Was that something you asked for?

A: That was something that was discussed, as a standard part of the procedures for—involved in the acquisition of the residual.

Yarden Affidavit Exhibit B (1 Erlanger Deposition at 81–82). The only conclusion that can reasonably be drawn from Erlanger's recollection of the March 5, 1987 telephone conversation with Kightlinger is that there was no deal until the contracts were signed. In other words, "[t]he negotiations of the parties ... made it clear that the obligations of both [parties] were contingent upon the execution and delivery of the

formal contract documents." *SCM Corp.*, 727 F.2d at 265 (citing *Brause v. Goldman*, 10 A.D.2d 328, 199 N.Y.S.2d 606 (1st Dep't 1960), *aff'd mem.*, 9 N.Y.2d 620, 172 N.E. 2d 78, 210 N.Y.S.2d 225 (1961)). *Goldman*, 10 A.D.2d 328, 199 N.Y.S.2d 606 (1st Dep't 1960), *aff'd mem.*, 9 N.Y.2d 620, 172 N.E. 2d 78, 210 N.Y.S.2d 225 (1961). Without a promise clear and unambiguous in its terms, there is no promissory estoppel. Shearson's own evidence shows not only that no such promise was given by TCF, but instead proves that a contingent promise was made. Therefore, Shearson's promissory estoppel claim cannot be sustained. Accordingly, TCF's motion for summary judgment dismissing Shearson's claim based on promissory estoppel is granted.

For the reasons set forth above, TCF's motion is granted, and the complaint is dismissed.

SO ORDERED.