**P.A. BERGNER & CO., Plaintiff,**

v.

**Arthur C. MARTINEZ and Sears, Roebuck & Co., Defendants.**

**No. 92 Civ. 6501 (RWS).**

United States District Court, S.D. New York.

May 25, 1993.

Weil, Gotshal & Manges, New York City by Michael A. Epstein, of counsel, for plaintiff.

Sullivan & Cromwell, New York City by Gandolfo V. DiBlasi, of counsel, for defendants.

## *OPINION*

SWEET, District Judge.

Defendants, Arthur C. Martinez ("Martinez") and Sears, Roebuck & Co. ("Sears"), have moved to dismiss the complaint of Plaintiff P.A. Bergner & Co. ("Bergner") pursuant to Rule 12(b)(6) and Rule 9(b), Fed. R.Civ.P. For the reasons given below, the motion is denied.

### *Facts*

On a motion to dismiss, the court will accept the facts supplied by the non-movant and draw all inferences in the opposing party's favor. These facts, accordingly, are drawn from the Plaintiff's Complaint and Memorandum in Opposition, and do not represent findings of fact by this Court.

Bergner, an Illinois corporation indirectly but wholly owned by a Swiss company, Maus Freres, S.A. ("Maus Freres"), owns and operates together with its subsidiaries some 68 department stores in Wisconsin, Illinois, Indiana and Minnesota. On August 23, 1991, Bergner filed a voluntary petition for reorga-

nization and protection from its creditors under Chapter 11 of the United States Code in the Eastern District of Wisconsin. As part of its restructuring, Bergner and its creditors have been searching for a new and appropriate CEO (its former CEO resigned on May 6, 1991).

On May 1, 1992, Bertrand Maus ("Maus"), Chairman of Bergner, met with Arthur Martinez, then Vice Chairman of Saks & Co., which owns and operates Saks Fifth Avenue ("Saks"). Martinez's employment contract with Saks was terminable at will, but it also specified certain severance benefits if Saks terminated Martinez without cause. On May 9, Martinez met with two other partners of Maus Freres, Didier Maus and Philippe Nordmann. By May 15, Martinez and Bertrand Maus were engaged in negotiating the terms of Martinez's employment agreement as CEO of Bergner. On May 27, Martinez sent a term sheet to Maus listing his initial terms and conditions for employment, and on June 9, Maus sent Martinez Bergner's term sheet. On June 19 and 20, 1992, Martinez went to Geneva, Switzerland, to meet with the partners of Maus Freres and to discuss the details of Bergner's plan of reorganization.

On June 20, 1992, after extensive negotiations, Bergner alleges that Martinez and the three partners of Maus Freres orally agreed on specific terms of employment which Bergner alleges were set down in full in a 24–page draft employment agreement (the "Draft Employment Agreement"). The Draft Employment Agreement was labeled "privileged and confidential" per Martinez's request; plans were also made to file the motion requesting Bankruptcy Court approval of Martinez as CEO of Bergner either *in camera* or under seal.

The Bankruptcy Court had to approve Martinez's appointment and the terms of his contract because Bergner was in reorganization under Chapter 11 (*see, e.g.,* 11 U.S.C. § 1108). Martinez requested an indemnification agreement to protect him in the event that Saks were to terminate his employment because of his negotiations with Bergner, but Maus refused to provide one until Martinez committed to becoming CEO. Once Martinez orally committed himself to becoming CEO, Maus supplied an indemnification agreement. On July 6, 1992, Maus in his capacity as Partner of Maus Freres and Martinez entered into a formal written agreement that if (i) the Bankruptcy Court did not approve the appointment of Martinez as Bergner's CEO on or before September 15, 1992, and (ii) Saks terminated Martinez's employment without cause and failed to honor certain obligations to him, then Maus Freres would indemnify Martinez for certain losses (the "Indemnification Agreement"). These losses, enumerated in the Indemnification Agreement, included any amounts due but unpaid to Martinez from Saks, unpaid severance, the cost of Saks' stock purchased by Martinez which he had a right to require Saks to repurchase, and all out-of-pocket costs incurred by Martinez in pursuing his rights against Saks. The Indemnity Agreement gives an exact number only for the cost of stock, which it states that Martinez has represented as being worth $972,900, but it clear that, all told, Maus could easily be liable for more than a million dollars under the Indemnity Agreement. The Indemnification Agreement did require Martinez to first attempt to collect these sums from Saks.

The Indemnification Agreement stated that it was based on Martinez's "willingness to enter into such agreement [of employment] as and when it is approved by the Bankruptcy Court." However, it also stated that, "[a]lthough you have not legally committed to do so, you have advised [Bergner] that it is your present intention to enter into the Employment Agreement [with Bergner] if and when it is approved by the Bankruptcy Court and thereupon terminate your employment with Saks." (Def.Aff.Ex. A at 30).

That same day, as soon as the ink was dry on the Indemnification Agreement, Martinez informed Bergner that he had notified senior officer at Saks that he was terminating his employment agreement with Saks to become Bergner's CEO (Pl.Compl. ¶ 25). However, he told Saks that he would complete several projects that he was working on for them at the time.

On July 7, 1992 (the day after the Indemnification Agreement was signed and Mar-

tinez quit his employment with Saks), Martinez met in New York with the management team of Bergner and reviewed Bergner's business and strategic plans. On July 13, 1992, the Board of Directors of Bergner appointed Martinez to serve as CEO and approved the Employment Agreement; this was subject, of course, to the Bankruptcy Court's approval. Finally, in mid-July 1992, Martinez and his counsel reviewed and approved a joint press release for use if the parties' intentions became public, announcing Martinez's appointment as CEO of Bergner and stating that Martinez was "enthusiastic about the opportunity to join the P.A. Bergner organization." During this time, however, Martinez responded to a request for comment about rumors of his departure from his current position by a leading trade newspaper for the apparel industry by stating that, "I don't plan to leave" on July 9, 1992.

Between July 20 and July 24, Bergner and the two creditors' committees set up in Bergner's bankruptcy case, the Bank Creditors' Committee and the Trade Creditors' Committee, met in order to secure the committees' support for Martinez's appointment as Bergner's CEO. On July 27, the Bank Creditors' Committee announced its approval of the appointment of Martinez as CEO. When counsel for Bergner tried to reach Martinez with this news on July 28, however, they were informed that Martinez was negotiating about becoming CEO with Sears. Maus called Martinez about this on July 29, and Martinez assured him that the call from Sears was unsolicited, that he was committed to Bergner, and that he would break off all talks with Sears immediately. (Pl.Compl. at ¶ 38).

On August 5, 1992, counsel for Bergner filed a motion with the United States Bankruptcy Court for the Eastern District of Wisconsin, requesting approval for the appointment of Martinez as CEO of Bergner. Hearing on the motion was scheduled for August 11, 1992, and arrangements were made for Martinez to be in Wisconsin on Monday, August 10, to prepare for the hearing.

On August 10, 1992, counsel for Martinez called Bergner's attorneys and informed that Martinez had already accepted and signed an employment agreement with Sears. This lawsuit followed.

### Discussion

Bergner alleges seven causes of action altogether, four against Martinez (misrepresentation and fraud, detrimental reliance, breach of the indemnification agreement, and breach of the oral agreement to enter into an employment agreement) and three against Sears (tortious interference with contractual relation for each of two contracts and another for prospective business advantage). All parties agree that all claims are governed by New York law and that Bergner, as the intended third-party beneficiary of the Indemnification Agreement between Maus and Martinez, has standing to sue on the Indemnification Agreement.

### Claims Against Martinez

Bergner alleges that Martinez breached two contracts with Bergner, and did so through misrepresentation and fraud. Martinez asserts that neither set of circumstances alleged by Bergner constitutes a contract between the parties, denies the allegations of fraud, and asserts that the incidental business expenses to which Bergner was put cannot justify Bergner's claim for detrimental reliance.

### Breach of the Preliminary Contract to Negotiate and Enter Into An Employment Agreement in Good Faith

■ There are at least two distinct types of preliminary contracts with binding force. *Teachers Ins. & Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491, 498 (S.D.N.Y.1987). The first type occurs when the parties have reached complete agreement on all the issues which require negotiation. "Such an agreement is preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement. The second stage is not necessary; it is merely considered desirable." *Id.* Such an unwritten agreement may take effect before the formal writing is drawn up and signed, since the parties have intended the informal agreement itself to be the contract and the writing is a mere memorialization of it. *Id.; see also V'Soske v. Barwick,* 404 F.2d 495, 499 (2d

Cir.1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969), *quoting* Restatement (Second) of Contracts § 26 (then Tent. Draft No. 1, 1964), 1 Corbin on Contracts § 30 (1950), 1 Williston on Contracts § 28 (2d ed. 1957).

Bergner alleges that the existence of the Draft Employment Agreement and the necessity for gaining the approval of the Bankruptcy Court show that the preliminary oral agreement between Bergner and Martinez here is an example of the second type, one that expresses mutual commitment to a contract on agreed major terms. *Teachers Ins.,* 670 F.Supp. at 498.

■ The parties may execute such an agreement in order to demonstrate their commitment to each other during ongoing negotiations, since typically "enforceable legal rights do not arise from contract negotiations until both parties consent to be bound or, in any event, manifest that consent to each other," *Chrysler Capital Corp. v. Southeast Hotel Properties Ltd. Partnership,* 697 F.Supp. 794, 799 (S.D.N.Y.1988), *aff'd,* 888 F.2d 1376 (2d Cir.1989). Under these circumstances, the parties may make an oral, binding "agreement to agree," i.e., an agreement expressing an intent to be bound in a formal, written agreement. Even if open terms remain to be negotiated, "the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement." *Teachers Ins.,* 670 F.Supp. at 498. *See also Channel Home Centers, Div. of Grace Retail Corp. v. Grossman,* 795 F.2d 291 (3rd Cir.1986); *Teachers Ins. & Ann. Ass'n. v. Butler,* 626 F.Supp. 1229 (S.D.N.Y.1986). Both parties can fulfill their obligations under this second type of binding preliminary agreement, and yet not agree on the ultimate written contract, provided good faith differences in the negotiation of the open issues prevent the parties from reaching a final contract. Such an "agreement to agree," however, does prevent one party from arbitrarily abandoning the transaction or insisting on conditions that to do not conform to what was spelled out in the preliminary agreement. *Teachers Ins.,* 670 F.Supp. at 498. In effect, an agreement to agree buys a party an assurance that the transaction will falter only over a genuine disagreement, thus allowing a party strapped for time or money to go ahead with arrangements with a sufficient degree of confidence in the outcome:

> Giving legal recognition to preliminary binding commitments serves a valuable function in the marketplace.... without such legal recognition, parties would be obliged to expend enormous sums negotiating every detail of final contract documentation before knowing whether they have an agreement, and if so, on what terms. At the same time, a party that does not wish to be bound at the time of the preliminary exchange of letters can very easily protect itself by not accepting language that indicates a 'firm commitment' or 'binding agreement.'

*Teachers Ins.,* 670 F.Supp. at 499.

Bergner argues that during the meeting in Geneva on June 20, 1992, that Martinez and Maus entered into such a preliminary, oral agreement to negotiate and execute a written employment agreement. However, even an "agreement to agree" such as this one must meet the requirements necessary for formation of a binding contract:

> In any given case it is the intent of the parties that will determine the time of contract formation.... We have articulated several factors that help determine whether the parties intended to be bound in the absence of a document executed by both sides. The court is to consider (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing..... These circumstances may be shown by 'oral testimony or by correspondence or other preliminary or partially complete writings.' Restatement (Second) of Contracts § 27 comment c (1981).

*Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir.1985). *Accord R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 75–77 (2d Cir.1984); *Shearson Lehman Inc. v. TCF Banking & Sav., F.A.,* 710 F.Supp. 67, 70 (S.D.N.Y.1989).

The first factor counts against the existence of a preliminary agreement to agree in this case. Martinez explicitly reserved his rights in the signed Indemnity Agreement by stating that he had not "legally committed to" becoming CEO of Bergner, although it was his "present intention to enter into the Employment Agreement if and when it is approved by the Bankruptcy Court." Bergner alleges this phrase was included solely to prevent Martinez from being in breach of his employment agreement with Sears. Whatever the reason, the phrase does indicate the parties' clear intent that Martinez was not to be bound, whatever the reason, until he received the approval of the Bankruptcy Court. Although the Indemnity Agreement is an agreement between the same two parties made separately from the alleged oral agreement, this express reservation of Martinez's rights, accepted by Bergner when it signed the Indemnity Agreement, on its face explicitly contradicts what Bergner has alleged as terms for the oral agreement.

Martinez goes further, however, and alleges this express reservation forecloses any possibility of an oral "agreement to agree" on his employment. This is not the case. No single factor is decisive, and each provides significant guidance. *Horn & Hardart Co.,* 751 F.2d at 75; *Shearson,* 710 F.Supp. at 70. Should the other three factors slant in favor of Bergner, surrounding circumstances may prevent this particular reservation of rights from being controlling.

■ Unfortunately for Bergner, the other three factors are not overwhelmingly in support of a binding oral agreement to enter into the Draft Employment Agreement. The second factor, partial performance of the contract, is somewhat in support of the Plaintiff. Necessary steps taken in furtherance of negotiations do not count as partial performance of an agreement to agree, *see Shearson,* 710 F.Supp. at 71 ("The passing of documentation back and forth . . . necessarily

means that one of the parties will have to spend money to prepare and revise the draft. . . . [but] that does not change the essential character of the act," which remains merely preparatory). Partial performance requires some actual performance of the contract, and the test is therefore the same as for unjust enrichment: Bergner must have conferred something of value upon Martinez which Martinez accepted. *Id.* at 71; *Horn & Hardart,* 751 F.2d at 76.

■ Bergner's activities, however, extended to more than merely negotiations; it secured the approval of its Creditors' Committees and made a motion before the Bankruptcy Court. However, partial performance of the contract must secure a benefit to the other party to be enforceable. Here, Martinez was given the security of the arrangements to become CEO of Bergner, which he could use in negotiating with other employers. This partial performance counts in favor of Bergner.

Bergner alleges that the oral agreement to enter into an Employment Agreement fulfills the third factor, for Bergner alleges there were no terms of the Employment Agreement left to negotiate. But the process of obtaining support for the agreement from the proposed creditors resulted in the re-drafting of certain terms of the proposed agreement in July. Courts have found that changes in the drafts indicate that there may be material points of contention between the parties even after the parties themselves believe they have reached a fundamental agreement: "the actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution," *Horn & Hardart,* 751 F.2d at 75; *Winston,* 777 F.2d at 82.

These changes in drafts prevent the third factor from counting completely in Bergner's favor. Certain circumstances, however, distinguish this instance from the usual "changes in the drafts means no complete contract" than would usually be the case. First, the changes made to the Draft Employment Agreement were made by consultation with the committees, third parties to the

agreement, indicating that Bergner and Martinez had already reached a substantial understanding between them. Second, a preliminary "agreement to agree"—as opposed to an actual employment agreement—does not indicate that the parties have an agreement, merely that they intend in good faith to negotiate towards one. A preliminary agreement to agree requires the parties to define the basic scope of the agreement which they are trying to reach, but that basic scope allows the parties to have an agreement despite outstanding issues:

> The existence of open terms is always a factor tending against the conclusion that the parties have reached a binding agreement. But open terms obviously have a somewhat different significance where ... the nature of the contract alleged is that it commits the parties in good faith to negotiate the open terms. To consider the existence of open terms as fatal would be to rule, in effect, that preliminary binding commitments cannot be enforced. That is not the law.

*Teachers Ins.*, 670 F.Supp. at 499. The third factor, therefore, weighs in favor of Bergner.

The fourth factor—whether or not it is customary to put such agreements in writing—counts in favor of Martinez. As the defendants point out, preliminary agreements to agree are usually written in the form of "commitment letters" or "letters of intent." *See, e.g., Teachers Ins.*, 670 F.Supp. at 449; *Teachers Ins. & Annuity Ass'n v. Coaxial Communications, Inc.*, 799 F.Supp. 16, 18 (S.D.N.Y.1992); *Chrysler*, 697 F.Supp. at 801; *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir.1989). In the absence of custom, courts will assume that a transaction of sufficient substance or complexity will usually require a writing, and the scope of the parties' intended agreement here was for a transaction of such substance or complexity. *Cf. Winston*, 777 F.2d at 83 ("the $62,500 at issue is not a trifling sum, and payment was to be made over several years"). No such letter of intent exists here.

■ Thus, the balance of factors indicates that the oral agreement to enter into

1. N.Y.Gen.Oblig.L. § 5–701.

an Agreement of Employment alleged here by Bergner is not an enforceable contract. However, since Martinez also alleges that such a contract, if it existed, would be invalid under the Statute of Frauds [1] on the grounds that it is an oral agreement which by its terms would not be fulfilled within one year, it is worth noting that such an agreement is not invalid because of the Statute of Frauds. Bergner correctly reasons that since the oral preliminary agreement was only to negotiate for a written employment agreement, it must end by September 15, 1992, the date specified for the termination of negotiations in the Indemnification Agreement. The Statute of Frauds requires an agreement to be in writing if by its terms it is not to be performed within one year from its making. *North Shore Bottling Co. v. C. Schmidt & Sons, Inc.*, 22 N.Y.2d 171, 175, 239 N.E.2d 189, 191, 292 N.Y.S.2d 86, 89 (1968), *Marini v. D'Apolito*, 162 A.D.2d 391, 392, 557 N.Y.S.2d 45 (1st Dep't 1990).

### Breach of the Indemnification Agreement

■ Bergner also argues that Martinez breached the terms of his written Indemnification Agreement with Maus. By its terms, the:

> purpose of this Letter [Agreement] is to provide you with certain protection if (i) the United States Bankruptcy Court for the Eastern District of Wisconsin ... does not approve the terms of a proposed employment agreement between you and P.A. B[ergner] on or before September 15, 1992, notwithstanding your willingness to enter into such agreement as and when it is approved by the Bankruptcy Court, and (ii) Saks terminates your employment without cause and fails to honor certain of its obligations to you.

Complaint, Exh. A., at p. 1. Martinez, however, points to language of the contract which states "[a]lthough you have not legally committed to do so, you [Martinez] have advised [Bergner] that it is your present intention to enter into the PAB[ergner] Employment Agreement if and when it is approved by the Bankruptcy Court." *Id.*, at p. 2.

As Martinez properly argues, the language of this clause does negate any legal liability on Martinez's part for the written Employment Agreement. By the same logic, however, it bound Martinez to his stated intent to become CEO of Bergner at the time his appointment was approved by the Bankruptcy Court. The moment that intention changed without notice to Bergner, Martinez breached this contract,[2] and breached the covenant of good faith and fair dealing implied under New York law in every contract. *Carvel Corp. v. Diversified Mgmt. Group,* 930 F.2d 228, 230 (2d Cir.1991); *Don King Prods., Inc. v. Douglas,* 742 F.Supp. 741, 767 (S.D.N.Y.1990); *In re Gulf Oil/Cities Service Tender Offer Lit.,* 725 F.Supp. 712, 735–38 (S.D.N.Y.1989); *Binks v. Farooq,* 178 A.D.2d 999, 578 N.Y.S.2d 335 (4th Dep't 1991), *appeal denied,* 80 N.Y.2d 752, 600 N.E.2d 631, 587 N.Y.S.2d 904 (1992); *Bass v. Sevits,* 78 A.D.2d 926, 433 N.Y.S.2d 245 (3rd Dep't 1980). The consideration supplied by Martinez for the Indemnification Agreement was his continuing intent to become Bergner's CEO. The caveat about "not legally committed" renders the promise to become CEO only a promise, not a contract; but the present intention to become CEO when his appointment was approved by the Bankruptcy Court was the consideration for the contract, and when the intention changed, that change itself without notice to Bergner was a breach of the contract.

Martinez' change without notice to Bergner is a breach of contract because it is a breach of a duty to deal in good faith under the Indemnity Agreement. The Indemnity Agreement itself was triggered by two conditions: first, Saks must refuse to pay Martinez benefits under his employment agreement with Saks, and, second, the Bankruptcy Court must refuse to approve Martinez's appointment as CEO of Bergner on or before September 15, 1992. Presumably Bergner has no control over the first condition. The second, however, requires Bergner to act in good faith, for its puts no limitations on why the Bankruptcy Court might disapprove of Martinez's appointment. Any acts by Bergner, in good faith or bad, and including any unilateral decisions not to recommend Martinez to any creditors' committee or to the court, trigger the Indemnity Agreement. Bergner is explicitly required to act in good faith, for Bergner cannot cancel its decision to recommend Martinez without incurring the substantial penalty of the Indemnities.

"It is axiomatic that every contract has an implied covenant of good faith and fair dealing." *In re Gulf Oil,* 725 F.Supp. at 735, *quoting Gelder Medical Group v. Webber,* 41 N.Y.2d 680, 684, 363 N.E.2d 573, 394 N.Y.S.2d 867, 871 (1977). Martinez alleges that the "not legally committed" language allowed him to negotiate with other employers. For Martinez's argument about the "not legally committed" language to be correct, then he signed an agreement with Bergner which required only Bergner to negotiate in good faith and which makes Bergner liable for incidents beyond its control even if Bergner diligently fulfills all its obligations in complete good faith.

Martinez essentially argues, in effect, that he had an "express provision," for "[a]s to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct," *VTR, Inc. v. Goodyear Tire & Rubber Co.,* 303 F.Supp. 773, 778 (S.D.N.Y.1969); *accord, Neuman v. Pike,* 591 F.2d 191, 195 (2d Cir. 1979). Since the intentions of the parties control the contract, Martinez's interpretation could be accurate: it is possible to draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties.

But the trick is to tell *when* a contract has been so drawn—and surely the mere recitation of an express power is not always the test.... Where what is at issue is the retroactive reduction or elimination of a

---

2. Bergner alleges that it first learned that Martinez was in communication with Sears on July 28, 1992, and that Martinez had received a telephone call from Sears on July 24, 1992. There are no facts supporting allegations that Martinez's present intention was not to enter into an employment agreement with Bergner before this date other than the speed with which Martinez terminated his employment at Saks and the secret nature of his negotiations with Sears. Bergner has not alleged a claim of fraudulent inducement in its Complaint.

central compensatory element of the contract—a large part of the *quid pro quo* that induced one party's assent—it is simply not likely that the parties had in mind a power quite as absolute as appellant suggests.

*Tymshare, Inc. v. Covell,* 727 F.2d 1145, 1153–54 (D.C.Cir.1984) (Scalia, J.). Martinez's "present intention" does not imply a power to change his mind and leave all other terms of the contract unaltered and enforceable. If Bergner's factual allegations are true, Martinez was in breach of his implied covenant of dealing in good faith when he did not inform Bergner that he did not have a present intention to go to work for them at least from July 28, when Martinez's counsel called to request a postponement of the filing of the motion for approval with the Bankruptcy Court, to August 10, when Bergner was informed that Martinez was going to work for Sears. *Columbia Broadcasting Sys., Inc. v. Stokely–Van Camp, Inc.,* 522 F.2d 369, 378 (2d Cir.1975) (contractual relationship triggers a duty to speak to avoid harm or injury to the other party).

### Detrimental Reliance

Bergner claims that its detrimental reliance on the oral agreement to agree should be used to calculate the correct measure of its damages. Since Martinez's oral promise to become the CEO of Bergner does not create an enforceable contract, Bergner's reliance claim can only be a claim for promissory estoppel.

A promisee's unsolicited reliance upon a promise is not consideration where it is not bargained for. Farnsworth, *Contracts,* § 2.19 (1982), at 89. Under promissory estoppel, the reliance itself becomes the grounds for recovery, and the absence of a bargain ceases to be a bar to enforcement or damages.[3] The courts have allowed recovery based solely on reliance only in certain specific circumstances.

"In New York, promissory estoppel has three elements: ' "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reasons of his reliance." ' " *Arcadian,* 884 F.2d at 73, quoting *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co.,* 804 F.2d 787, 793 (2d Cir.1986), quoting *Restatement (Second) of Contracts* § 90 (1981); accord, *Zucker v. Katz,* 708 F.Supp. 525, 533 (S.D.N.Y.1989); *Triology Variety Stores, Ltd. v. City Products Corp.,* 523 F.Supp. 691, 699 (S.D.N.Y.1981); *Swerdloff v. Mobil,* 74 A.D.2d 258, 427 N.Y.S.2d 266 (2d Dep't), *appeal denied,* 50 N.Y.2d 913, 409 N.E.2d 995, 431 N.Y.S.2d 523 (1980); *D & N Boening, Inc. v. Kirsch Beverages, Inc.,* 99 A.D.2d 522, 471 N.Y.S.2d 299 (2d Dep't), *aff'd,* 63 N.Y.2d 449, 472 N.E.2d 992, 483 N.Y.S.2d 164 (1984). Martinez alleges that the injury must be "unconscionable injury" in order to state a claim for promissory estoppel, and that Bergner's additional contract negotiations and the delay caused by the new search for a CEO does not amount to "unconscionable injury." The actual language of the cases simply indicates that where it would be "unconscionable" not to enforce a clear and ambiguous promise, the courts will do so. The injury itself does not have to be labeled "unconscionable" as long as the other party is injured as the result of its reliance. *Arcadian,* 884 F.2d at 73; *Triology,* 523 F.Supp. at 696–97; *James King & Son, Inc. v. DeSantis Construction No. 2 Corp.,* 97 Misc.2d 1063, 413 N.Y.S.2d 78, 81 (Sup.Ct. 1977).

Bergner has alleged all the elements of promissory estoppel. Bergner has alleged a clear and unambiguous promise by Martinez to become its CEO, its reliance upon that promise, and injury as a result. The injury is more than just the delay in getting a new CEO and the expenses incidental to the negotiation. A company in bankruptcy loses credibility with its creditors and with the

---

3. The term "promissory estoppel" comes from an analogy to "equitable estoppel." "Equitable estoppel" exists where the first party's misrepresentation of fact, relied on by the other party, precludes or "estopps" the first party from alleging or proving facts which contradict his previous representation. "Promissory estoppel" replaces the misrepresented fact with a promise: the promisor is precluded or "estopped" from alleging a lack of consideration in his promise. Farnsworth, *Contracts,* § 2.19, at p. 92.

Bankruptcy Court if the approval process goes as far as it did in this case with no result. Bergner's next set of decisions in furtherance of its reorganization are likely to come under closer and more rigorous scrutiny by its creditors' committees and by the Bankruptcy Court. Martinez's actions damage not just Bergner's current plan, but potentially damage the feasibility of other, future plans by tarnishing Bergner's image in the eyes of those whose approval is necessary. Even if Bergner's immediate damages do not amount to "unconscionable injury," Martinez's actions are "unconscionable" enough to justify Bergner's invocation of promissory estoppel.

### Fraud and Misrepresentation

Bergner has also states a claim for fraud and misrepresentation on the part of Martinez.

■ The elements of a claim for fraud in New York are a material misrepresentation, scienter, reliance, and damages. *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 406–07, 151 N.E.2d 833, 176 N.Y.S.2d 259 (1958); *Sabo v. Delman*, 3 N.Y.2d 155, 159–60, 143 N.E.2d 906, 164 N.Y.S.2d 714 (1957).

■ Misrepresentation of a present intent is actionable as fraud in New York; it is the present misrepresentation, not the future course of action, which defrauds the other party:

> [T]he allegations in the complaint describe a case where a defendant has fraudulently and positively as with personal knowledge states that something was to be done when he knew all the time it was not to be done and that his representations were false. It is not a case of prophecy and prediction of something which it is merely hoped or expected will occur in the future, but a specific affirmation of an arrangement under which something is to occur, when the party making the affirmation knows perfectly well that no such thing is to occur. Such statements and representations when false are actionable.

*Channel Master*, 4 N.Y.2d at 407–08, 151 N.E.2d 833, 176 N.Y.S.2d 259, *quoting Ritzwoller v. Lurie*, 225 N.Y. 464, 468, 122 N.E. 634 (1919).

■ Bergner alleges that, from the time that Martinez insisted on the Indemnity Agreement, Martinez was always intending to use the Indemnity Agreement as a financial safety net which would leave him free to bargain for his best offer from any employer, and therefore when Martinez was always lying when he alleged he intended to enter into an employment agreement with Bergner. Bergner alleges that Martinez's secret negotiations with Sears raises a strong inference that Martinez entered into the Indemnity Agreement intending to exploit Bergner's vulnerable position as a company in reorganization. Bergner alleges that, knowing that the parties could not be bound to an ultimate Employment Agreement without the approval of the Bankruptcy Court, Martinez convinced Bergner that he intended to sign the Employment Agreement if approved in order to stop Bergner from interviewing other potential candidates. Bergner alleges Martinez intended to reserve a position as CEO and the safety net of the Indemnity Agreement for himself while intending to negotiate freely with other employers. This states all the elements of fraud.

■ Martinez alleges that Bergner's fraud claims are barred because Bergner is pleading both fraud and breach of contract on the same facts, and because Bergner has not adequately plead Martinez's intent to deceive at the time he made his representations to Bergner. Both contentions are without merit.

If Martinez relied on the Indemnity Agreement without a present intention to become CEO of Bergner (or, perhaps more accurately, to become CEO of Bergner only if he could not get a better deal elsewhere), this breach of contract may also give rise to a fraud claim. The same acts may independently give rise to both fraud and breach of contract:

> Where the conduct alleged breaches a legal duty which exists "independent of contractual relations between the parties" a plaintiff may sue in tort. If the only interest at stake is that of holding the defen-

dant to a promise, the courts have said that the plaintiff may not transmogrify the contract claim into one for tort. But if in addition there is an interest in protecting the plaintiff form other kinds of harm, the plaintiff may recover in tort whether or not he has a valid claim for breach of contract. *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 898–99 (2d Cir.1980) (citations omitted); *Cavalier Label Co. v. Polytam, Ltd.*, 687 F.Supp. 872, 878 (S.D.N.Y.1988); *Backer v. Lewit*, 180 A.D.2d 134, 584 N.Y.S.2d 480, 483 (1st Dep't 1992). Martinez's breach of contract here consists of not informing Bergner that his intentions had changed. *Columbia Broadcasting*, 522 F.2d at 378. This serves both to state a cause of action for breach of the Indemnity Agreement—which depended upon Martinez's continuing "present intention"—and a tort, for Martinez knew that Bergner was relying upon the false impression which his representations had created.

 Bergner has also alleged additional activity on the part of Martinez which states a cause of action for misrepresentation and fraud. Martinez made these additional misrepresentations to Bergner on July 29, 1992, when Maus called Martinez about Martinez's discussion with Sears. The Complaint alleges:

19. Martinez apologized for the confusion and assured Bertrand Maus that he would terminate all discussion with Sears immediately. Martinez also assured Bertrand Maus that he was "committed to" Bergner. Martinez reassured Mr. Maus that the offer from Sears was unsolicited and that he had every intention to honor his Employment Agreement with Bergner. Martinez implored Bertrand Maus "not to worry." Martinez said to move forward and secure the approval of the Bankruptcy Court. Despite these representations, assurances and directions, on information and belief, Martinez had no intention of terminating, and did not terminate, his negotiations with Sears....

.... Martinez's counsel finally informed Bergner's counsel that Martinez would fly to Wisconsin on Tuesday morning August 11. He indicated that Martinez would be on time for the hearing [in front of the Bankruptcy Court concerning the Court's approval of Martinez as CEO].

43. One day before the Bankruptcy Court hearing, on Monday, August 10, 1992, counsel for Martinez called Bergner's attorneys and informed them that Martinez had accepted and signed an employment agreement with Sears.

Complaint ¶¶ 38, 42–43. These misrepresentations constitute fraud, not breach of contract, for Martinez's mere failure to inform Bergner that his plans had changed by itself breached the Indemnity Agreement. Additional misrepresentations about his ongoing negotiations with Sears are themselves separate acts of fraud, not dependent upon his obligations under the Indemnity Agreement.

Bergner's allegations in the Complaint identify the date, place, speaker, and the content of Martinez's misrepresentations with more than enough specificity to satisfy the requirements of Rule 9(b). *Spier v. Erber*, 759 F.Supp. 1024, 1030 (S.D.N.Y.1991). Bergner has also plead the necessary factual basis which gives rise to a 'strong inference' of fraudulent intent, *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990), quoting *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987), cert. denied, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), since Bergner has alleged facts showing a motive for committing fraud and a clear opportunity for doing so, *Beck*, 820 F.2d at 50. The motive here is supplied by the written Indemnity Agreement, which would ensure him the sizable severance benefits promised to him by Saks regardless of the termination of his employment at Saks, the Bankruptcy Court's approval, or even Bergner's own course of action. To preserve his benefits under the Indemnity Agreement, however, he had to lull Bergner into believing that he would become Bergner's CEO until he was absolutely certain of his other plans. Bergner has plead all the elements for fraud and misrepresentation with sufficient sufficiency to pass must under Rule 9(b).

### Bergner's Claims Against Sears

#### Tortious Interference with Contract

 To state a claim for tortious interference with existing contractual relations, a

plaintiff must allege the existence of a valid contract between the plaintiff and another party, the defendant's knowledge of that contract, the defendant's intentional procurement of a breach of that contract by the other party, and damages. *Schmid, Inc. v. Zucker's Gifts, Inc.*, 766 F.Supp. 118, 121 (S.D.N.Y.1991); *see also Don King*, 742 F.Supp. at 775; *American Cyanamid Co. v. Elizabeth Arden Sales Corp.*, 331 F.Supp. 597 (S.D.N.Y.1971).

█ Because there was no preliminary "agreement to agree" between the parties, Bergner's claim for tortious interference with the oral preliminary agreement necessarily fails. However, Bergner has stated a claim for tortious interference by Sears with the Indemnity Agreement. Martinez states that the Indemnification Agreement contains no language which could give rise to a claim that Martinez breached the agreement by entering into a contract agreement with Sears. Martinez claims that his statement of "present intention" in the Indemnification Agreement does not amount to a promise that he would refrain from entering into an employment agreement with another party, for the Indemnity Agreement "did not impose any obligations on the parties" unless and until Saks refused to pay Martinez any of his contractual benefits.

The defendants do not dispute that Sears had knowledge of the Indemnification Agreement. Bergner alleges that Sears intentionally convinced Martinez to break his promise to Bergner, and that this offer was a proximate cause of Martinez's breach of his contract with Bergner that caused damages. Bergner's allegations that Sears offered better terms is sufficient to satisfy the pleading requirements for this cause of action. *See, e.g., Don King Prods.*, 742 F.Supp. at 775–77 ("[i]n view of Mirage's knowledge of Douglas' existing Agreement providing that Douglas deal exclusively with King, an inference of an interfering intent arises from those facts, since persuasion to breach alone, as by an offer of better terms, may demonstrate improper interference with a contract of a definite term (as opposed to one terminable at will)") (citations omitted): *American Cyanamid*, 331 F.Supp. at 608 ("offer of a higher price would be relevant, indeed, to a finding of legal malice ... [were there] knowledge of an obligation already existing.").

### Interference with Prospective Business Advantage

█ A claim of tortious interference with a prospective business or economic advantage is identical to the prior claim except, of course, that it does not require a contract. For this claim, Bergner must allege facts which show that " 'the defendants interfered with business relations existing between the plaintiff and a third party, *either* with the sole purpose of harming the plaintiff or by means that are dishonest, unfair or in any other way improper.' " *Schmid*, 766 F.Supp. at 122, *quoting Martin Ice Cream Co. v. Chipwich, Inc.*, 554 F.Supp. 933, 945 (S.D.N.Y.1983) (emphasis in original).

Bergner alleges that Sears not only knew of Martinez's representations to Bergner, but that Sears accepted from Martinez a draft of the never executed employment agreement between Martinez and Bergner, which Bergner had marked "privileged and confidential." Bergner alleges that Sears made use of the information contained in the Draft Employment Agreement to entice Martinez to accept employment with Sears. This adequately alleges facts giving rise to an inference of dishonest and unfair interference with prospective business relations of Bergner.

### Conclusion

For the reasons cited above, the Defendants' motion to dismiss is hereby denied.

It is so ordered.