**I.R.V. MERCHANDISING CORP., Plaintiff,**

v.

**JAY WARD PRODUCTIONS, INC., Defendant.**

No. 93 Civ. 6143 (CHT).

United States District Court, S.D. New York.

June 24, 1994.

Howard Miskin, Ursula Day, Stoll, Miskin, Previto & Hoffman, New York City, for plaintiff.

Roger Zissu, Weiss Dawid Fross Zelnick & Lehrman, New York City, Ronald Rosen, Troy & Gould, Los Angeles, CA, for defendant.

## ORDER AND OPINION

TENNEY, District Judge.

Plaintiff I.R.V. Merchandising Corp. ("I.R.V.") brings this diversity action against defendant Jay Ward Productions, Inc., alleging breach of contract, promissory estoppel, and tortious interference with prospective economic advantage. Defendant moves for summary judgment to dismiss the complaint under Fed.R.Civ.P. 56(b). The court finds that disputed questions of material fact exist, and the motion is denied in part and granted in part.

### Background

■ The court derives the following recitation of facts from the affidavits and declarations of Mr. Irving Handelsman, Mrs. Ramona Ward and Ms. Tiffany Ward. Presented with a motion for summary judgment, the court resolves all disputed facts and reasonable inferences in favor of the non-moving

party. *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991). This statement of facts is therefore relevant only to this motion, and does not resolve any of the disputed factual issues that may be presented at trial.

I.R.V. is engaged in the business of licensing characters, copyrights and trademarks for a variety of businesses. Jay Ward Productions owns the copyrights and trademarks in several well-known cartoon characters. At issue in this dispute is the right to act as the licensing agent for many of Jay Ward Productions' popular and beloved characters, including Rocky the Flying Squirrel, Bullwinkle the Moose, Boris and Natasha, Dudley Do–Right, and several others ("the Ward Characters").

On March 27, 1991, Mrs. Ramona Ward and Ms. Tiffany Ward, the two principals of Jay Ward Productions, met with Mr. Irving Handelsman, I.R.V.'s president, in order to discuss I.R.V.'s proposal to serve as the licensing agent for the Ward characters. I.R.V. had previously been the licensing agent for several of the Ward characters from 1969 until 1991, acting as the agent of Filmtel, a third party that licensed the Ward characters on behalf of Jay Ward Productions during this period. Sometime between March 14, 1991 and April 15, 1991, Filmtel and Jay Ward Productions reached an agreement by which Filmtel relinquished any future claims to license the Ward characters.

Prior to the March 27 meeting, I.R.V. held preliminary telephone discussions with Ramona and Tiffany Ward outlining I.R.V.'s proposal. Mr. Handelsman claims that during these preliminary discussions, Ramona Ward assured him that I.R.V. would continue to act as the licensing agent for the Ward characters in the future. Declaration of Irving Handelsman at ¶ 10. Handelsman also claims that both Ramona and Tiffany Ward were familiar with the business affairs of Jay Ward Productions, were aware of the terms of previous licensing agreements, and were "tough negotiators." *Id.* at ¶ 13.

Handelsman claims that he presented the Wards with a list of former and prospective licensees at the March 27 meeting, along with estimates of royalty income and a form licensing agreement that he intended to use with future licensees. *Id.* at ¶ 15 & exh. 2. Ramona Ward then gave Handelsman records concerning prospective licensees whom she wanted Handelsman to contact. *Id.* at ¶ 18 & exh. 4. The Wards emphasized that they wanted to maximize the licensing income generated by the Ward characters as quickly as possible, and encouraged Handelsman to proceed immediately in obtaining licenses. *Id.* at ¶¶ 16, 20–22.

At this meeting, Tiffany Ward prepared a memorandum for I.R.V., which Ramona Ward signed. The memorandum was typed on Jay Ward Productions' letterhead and stated:[1]

March 27, 1991

> Dear Irv:
>
> This is to signify our intention to do business with I.R.V. Merchandising on an exclusive merchandising basis with the exception of three companies listed below. When we receive our lawyers go ahead per a contract to be signed and official written release from Peter Piech regarding merchandising rights we are prepared to pay at 25% commission on the first $500,000.00; 30% on the next million; 35% on the next $500,000.00 and 40% on everything over 2,000,000.00
>
> Details of payments, accounting details, etc. to be included in the contract. This contract is to be effective March 27, 1991 for two years.
>
> This intention to do business pertains to only to Bullwinkle, Rocky, Boris, Natasha, Mr. Peabody, Sherman, Dudley Do–Right, Aesop, Fractured Fairy Tales. [Hoppity Hooper]
>
> Sincerely,
>
> /s/
>
> Ramona C. Ward

---

1. Grammatical errors are left unchanged, and words that appear in brackets here appeared in handwriting in the original.

EXCLUSIONS TO CONTRACT: KRAFT FOODS [pasta], RALSTON PURINA [10%], KENTUCKY FRIED CHICKEN

*Id.* at exh. 5.

The Wards instructed Handelsman to seek licensees immediately, and stated that a final agreement would be prepared by the Wards' attorney. *Id.* at ¶¶ 21–22. Within the next several days, Handelsman apparently secured several licensing agreements. He notified Ramona Ward of these agreements by telephone, and later forwarded the advance license payments. Handelsman claims that Mrs. Ward "expressed pleasure" with his activities and "urged him on." *Id.* at ¶ 23.

On April 4, 1991, I.R.V. received a letter dated April 3, 1991 from Jay Ward Productions. The letter stated that Jay Ward Productions had reconsidered its "preliminary feeling" and had decided not to enter into an agreement with I.R.V. *Id.* at exh. 7. Jay Ward Productions eventually granted MCA the right to obtain licenses for the Ward characters. Some of the prospective licensees first contacted by Mr. Handelsman eventually entered into agreements for the Ward characters through MCA. Tiffany Ward Decl. at ¶ 25. Jay Ward Productions did not pay I.R.V. commissions for any of these licenses. Handelsman claims that the actions of Jay Ward Productions denied I.R.V. its commissions on these licenses and destroyed I.R.V.'s reputation for reliability, honesty and trustworthiness among licensees.

### Discussion

#### A. *Existence of a Contractual Obligation*

■ I.R.V. has presented sufficient evidence to raise disputed questions of material fact regarding whether Jay Ward Productions intended to be bound by the March 27 agreement. Under New York law, if the parties do not intend to be bound by an agreement until it is in writing and signed, no contract exists until that event occurs. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984); *Scheck v. Francis,* 311 N.Y.S.2d 841, 843, 26 N.Y.2d 466, 470, 260 N.E.2d 493, 494–95 (1970). However, if the parties intend to, they can enter into a binding contract based on verbal discussions or preliminary writings even if they contemplate a later formal writing to memorialize the agreement. *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir. 1985).

■ Defendant claims that creation of a contractual obligation was contingent upon incorporating all the material terms of the agreement into a formal written contract to be signed by the parties and approved by counsel. Plaintiff claims that the parties intended to be bound as of March 27, and that the parties anticipated that a later written contract would be executed merely to memorialize the agreement reached at the March 27 meeting. The court looks to the objective expressions of the Wards to determine whether they intended to bind Jay Ward Productions through informal writings and verbal statements, or whether the Wards intended to "maintain complete immunity from all obligation until a written agreement [was] executed." *R.G. Group,* 751 F.2d at 74.

■ An enforceable agreement can exist even if the parties have expressed an intent to be bound in a later, more formal written agreement. *P.A. Bergner & Co. v. Martinez,* 823 F.Supp. 151, 156 (S.D.N.Y.1993). In determining whether the parties intended to be bound prior to signing a formal contract, the court looks to several factors, including: (1) whether there has been an express reservation of the right not to be bound in the absence of a later contract, (2) whether there was partial performance of the agreement, (3) whether the negotiations had settled all of the terms of the contract, and (4) whether the agreement concerned the sort of complex business matters that are normally subject to a written contract. *Winston,* 777 F.2d at 80.

The court assigns considerable weight to the fact that the March 27 Memorandum states explicitly that the Wards contemplated a later contract to be drafted by their attorneys. *See R.G. Group,* 751 F.2d at 75. Specifically, the Memorandum stated that the Wards were prepared to pay the agreed-upon sliding commission scale "[w]hen we receive our lawyers go ahead per a contract to be signed...."

This explicit statement has substantial probative value. However, it fails to conclusively resolve the issue at the summary judgment stage when viewed along with the other objective expressions of intent. Significantly, the Memorandum states that the Ward–I.R.V. agreement was effective as of March 27. This statement infers that the parties intended that a licensor-agent relationship was created as of March 27, which relationship would later be memorialized in a formal writing.

Several other facts support an inference that the Wards intended to be bound as of March 27. Handelsman claims that the Wards provided I.R.V. with the names of prospective licensees at the March 27 meeting, encouraged him to contact prospective licensees as soon as possible, and desired an immediate maximization of license income. Such actions indicate that the Wards intended I.R.V. to begin contacting prospective licensees on behalf of Jay Ward Productions immediately, creating additional triable issues of fact regarding when the Wards intended the agreement to take effect. *Compare with Scheck*, 311 N.Y.S.2d at 843, 26 N.Y.2d at 470, 260 N.E.2d at 494 (writings indicated that obligations would begin only after both parties had signed a formal contract).

■ The issue of partial performance also presents disputed questions of fact. Partial performance by one party, combined with acceptance of that performance by the other party, signals that the parties believed that a binding agreement existed between them. *See R.G. Group*, 751 F.2d at 75–76. Handelsman claims that he contacted several potential licensees immediately after the March 27 meeting, who promised roughly $500,000 in advance royalty payments, and that the Wards ultimately entered into license agreements with some of these licensees. The Wards concede that Handelsman contacted these prospective licenses, and that Jay Ward Productions eventually entered into license agreements with some of them. However, the Wards claim that I.R.V. did not initiate contact with many of these licensees, and that the terms of the license agreements ultimately entered into by the Wards differed materially from those proposed by I.R.V.

■ At the summary judgment stage, the disputed factual questions regarding whether Handelsman partially performed under the agreement and whether the Wards accepted this performance must be resolved in favor of Handelsman. I.R.V. appears to have partially performed the contract. Acceptance by the Wards might be inferred from Ramona Ward's encouragement of Handelsman's efforts during their phone conversations between March 27 and April 4, and by later entering into license agreements with some of the licensees contacted by Handelsman.

The court also looks to whether the parties had resolved all of the terms of the agreement. The March 27 meeting and Memorandum resolved issues regarding the term of the contract, the specific characters it would cover, the sliding payment commission rate, the effective date of the contract, and the parties with which I.R.V. was prohibited from dealing with. However, the March 27 Memorandum states that: "Details of payments, accounting details, etc. to be included in contract." The parties appear to have resolved all of the most significant issues at the meeting, but other issues remained to be worked out. Although these remaining issues may have been minor details, the court cannot find that there was "literally nothing left to negotiate." *See Winston*, 777 F.2d at 82.

■ The fact that the parties had not resolved all of the terms of the contract weighs in favor of a finding that no contract existed. However, it does not preclude the existence of a contract. See *P.A. Bergner*, 823 F.Supp. at 156 (the fact that the parties agreed that open terms remained to be negotiated did not preclude creation of a binding agreement).

The court also looks to whether this is the type of contract usually put in writing. Defendant has not presented any evidence that this type of licensing agreement is generally memorialized only in a formal written contract. In fact, defendant concedes that it did not enter into a formal written contract with Filmtel during the twenty-two year duration

of its service as licensing agent for the Ward characters. Decl. of Tiffany Ward at ¶ 2.

■ Defendant also claims that the agreement was contingent upon defendant securing a release from Filmtel regarding any rights Filmtel might claim to license the Ward characters in the future. A condition precedent to performance of a contract is an event "not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." *Merritt Hill Vineyards Inc. v. Windy Heights Vineyard, Inc.,* 472 N.Y.S.2d 592, 596, 61 N.Y.2d 106, 113, 460 N.E.2d 1077, 1081 (1984). Conditions precedent differ from promises to perform. *Id.* The parties may make an enforceable promise to perform if the promise anticipates a future event certain to occur. *See Schuler–Haas Electricity Corp. v. Aetna Casualty & Surety Co.,* 371 N.Y.S.2d 207, 211–12, 49 A.D.2d 60, 66 (4th Dept.1975).

■ Although the Wards interpret the reference to a release as creating a condition precedent, other reasonable interpretations exist. One possible interpretation is that obtaining the formal written release was part of the Wards' contractual obligations. Another possible interpretation is that commission payments by the Wards would have to postdate receipt of the release from Filmtel. Where a contract term is ambiguous, New York law disfavors construing the term as creating a condition precedent. *Manning v. Michaels,* 540 N.Y.S.2d 583, 584, 149 A.D.2d 897, 898 (3rd Dept.1989). At this stage in the proceeding, the court cannot determine whether obtaining the Filmtel release was a condition precedent to the formation of a contract. There is no indication in the record that obtaining the release was "not certain to occur," as is required for a condition precedent to exist. A letter from Ramona Ward to Filmtel indicates that Filmtel had already agreed to provide such a release at least as early as March 14, 1991, and obtaining the release may have been a certain event. *See* Exh. 3 to Declaration of Tiffany Ward.

Based on the affidavits and exhibits presented at this stage of the proceeding, the court finds that disputed question of facts

exist regarding whether Jay Ward Productions intended to be contractually bound to I.R.V. as of March 27. Viewing the Wards' objective expressions of intent in their entirety and in the light most favorable to I.R.V., it is unclear whether the Wards expressly reserved the right not to be bound in the absence of a contract, whether there was partial performance of the contract, whether the agreement concerned the type of matters normally subject to a written contract, and whether the Filmtel agreement constituted a condition precedent. Summary judgment would therefore be inappropriate.

### B. *Statute of Frauds*

■ The services that I.R.V. discussed with Jay Ward Productions fall within the definition of "services rendered in negotiating a business opportunity" within the meaning of New York's Statute of Frauds. *See* N.Y.Gen.Obligations Law § 5–701(a); *Sporn v. Suffolk Marketing, Inc.,* 453 N.Y.S.2d 393, 394, 56 N.Y.2d 864, 865, 438 N.E.2d 1108, 1109 (1982). In order to satisfy the Statute of Frauds, the writing must contain all the essential and material terms of the agreement. *HPSC, Inc. v. Matthews,* 579 N.Y.S.2d 474, 475, 179 A.D.2d 974, 975 (3rd Dept.1992); *Tetz v. Schlaier,* 559 N.Y.S.2d 560, 561, 164 A.D.2d 884, 885 (2d Dept.1990). A preliminary agreement satisfies New York's Statute of Frauds if it expresses a mutual commitment to contract on agreed-to major terms, even if some open terms remain to be negotiated. *P.A. Bergner,* 823 F.Supp. at 156.

■ The March 27 Memorandum specified the starting date and term of the agreement, the rate at which commissions would be paid, the characters that I.R.V. could seek licenses for, and included a list of licensees that I.R.V. could not contact. However, the Memorandum noted that details of payments and accounting would be worked out in a later contract. At this stage of the proceedings, the court cannot conclude as a matter of law that the remaining issues regarding accounting and payment constituted essential and material terms to this contract, particularly since the Memorandum describes these

issues as "details." Given the current state of the record, the court must deny summary judgment on defendant's Statute of Frauds defense.

### C. *Promissory Estoppel*

 Defendants also seek to dismiss I.R.V.'s claim of promissory estoppel. Under New York law, a claim of promissory estoppel requires plaintiff to demonstrate a clear and unambiguous promise, reasonable and foreseeable reliance upon that promise, and injuries sustained as a result of that reliance. *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir.1989). I.R.V.'s declarations create sufficient disputed questions of fact regarding the existence of a promise, reliance upon that promise, and damages, precluding entry of summary judgment. As discussed below, however, some of the damages alleged by plaintiff are not compensable under this cause of action.

### D. *Damages*

 The court must dismiss plaintiff's contract and promissory estoppel causes of action insofar as those claims seek damages for a loss of reputation. New York law generally does not permit damages for loss of reputation in breach of contract actions. *Keene Corp. v. Bogan*, 1990 WL 1864 at *17 n. 7 (S.D.N.Y.1990); *Karetsos v. Cheung*, 670 F.Supp. 111, 115 (S.D.N.Y.1987); *MacArthur Constr. Corp. v. Coleman*, 457 N.Y.S.2d 530, 531, 91 A.D.2d 906, 906 (1st Dept.1983). Although certain cases recognize that damages due to a loss of reputation may be recovered under New York contract law, these cases carefully limit such claims by requiring the plaintiff to allege specific business opportunities lost as a result of the plaintiff's diminished reputation. *See International Ravissant II Corp. v. Hanna Ayoub Oriental Rugs*, 1990 WL 48007 at *2, No. 90–CV–781 (TCP) (E.D.N.Y. Apr. 11, 1990) (denying relief on contract claim alleging damages to reputation since plaintiff failed to specify loses stemming from the loss of reputation); *P.A. Bergner*, 823 F.Supp. at 160–61 (permitting promissory estoppel claim alleging specific damages to bankruptcy plan stemming from plaintiff's loss of credibility before creditors'

committees and Bankruptcy court). Although I.R.V. has broadly claimed a loss of reputation, it has not enumerated any specific harms arising from the alleged loss of reputation. *See* Handelsman Decl. at ¶ 27. The court must therefore dismiss, as a matter of law, I.R.V.'s contract and promissory estoppel claims only insofar as those claims allege a loss of reputation.

### E. *Tortious Interference With Prospective Economic Advantage*

 Plaintiff also brings a claim for tortious interference with prospective economic advantage. A claim for tortious interference with prospective economic advantage requires a showing that the defendant interfered with business relations existing between the plaintiff and a third party, either with the sole purpose of harming the plaintiff or by means that are dishonest, unfair or in any other way improper. *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 269 (2d Cir.1987).

 As a matter of law, the relationship between I.R.V. and prospective licensees cannot be construed as the sort of contractual business relationship protected by the tort of interference with prospective economic advantage. I.R.V. has failed to allege any relationship with these licensees other than acting solely as the agent for Jay Ward Productions. The only contractual relationships created would have been between Jay Ward Productions and the licensees. The licensees would not have paid commissions or any other form of consideration to I.R.V., nor would I.R.V. have been a party to the written licensing contracts. *See* Handelsman Decl. at exh. 3. Any licensing agreements would have been subject to the unilateral approval of Jay Ward Productions. Having failed to identify a prospective contractual relationship between it and any third party, I.R.V.'s cause of action for tortious interference with prospective economic advantage should be dismissed. *See Kosson v. Algaze*, —— A.D.2d ——, ——, 610 N.Y.S.2d 227, 228 (1st Dept. 1994) (no cause of action for intentional interference with contract against defendant who was party to contract); *Manley v. Pandick Press, Inc.*, 424 N.Y.S.2d 902, 904, 72 A.D.2d

452, 454 (1st Dept.1980) (no cause of action against defendant for tortiously interfering with its own contract).

Defendant's motion to dismiss plaintiff's claims for breach of contract and promissory estoppel is DENIED. Defendant's motion to dismiss those portions of plaintiff's contract and promissory estoppel claims seeking damages to reputation is GRANTED. Defendant's motion to dismiss plaintiff's claim for tortious interference with prospective economic advantage is GRANTED. Those portions of plaintiff's complaint alleging damage to its reputation and alleging tortious interference with prospective economic advantage are DISMISSED.

So ordered.